# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-1659V**

|  |  |
|---|---|
| LUCILLE ABSHIRE, | Chief Special Master Corcoran |
| Petitioner, | Filed: April 24, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.*

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM[1]

On November 8, 2022, Lucille Abshire filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccine she received on October 9, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Although the record supports the conclusion that Petitioner likely suffered the residual effects of her alleged injury for more than six months, and suffered onset of pain

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

within 48 hours after her vaccination, Petitioner's Table SIRVA claim must still be dismissed because her symptoms were not limited to the vaccinated shoulder. This may leave a causation-in-fact claim to be adjudicated, however.

## I.      Relevant Procedural History

On January 12, 2024, 14 months after the case was initiated, Respondent filed a Rule 4(c) Report arguing that Petitioner had not established entitlement to compensation. ECF No. 12. Respondent argued that Petitioner had not provided preponderant evidence that her pain began within 48 hours of her vaccination or that her symptoms were limited to the shoulder in which she received the vaccine. Rule 4(c) Report at 7-8.

I subsequently ordered the parties to brief the issue of entitlement. Petitioner filed her Motion for Ruling on the Record ("Mot."), along with additional exhibits, on April 17, 2024. ECF No. 28. Respondent filed a response ("Resp.") on June 17, 2024, in which he raised, for the first time, an additional argument that Petitioner had not satisfied the six-month severity requirement. ECF No. 32. Petitioner filed a reply ("Repl.") on July 1, 2024. ECF No. 34. The matter is now ripe for decision.

## II.     Factual History

Petitioner was 83 years old when she received a flu vaccine in her right deltoid on October 9, 2020. Ex. 10 at 2. Although her medical history included a right knee replacement, hypertension, and lower back pain, Petitioner had no history of pain or dysfunction of her right shoulder prior to vaccination. *See* Ex. 2 at 166-69. She recalled pain beginning the day after her vaccination that was severe "to the extent that [she] essentially was unable to use [her] right arm at all." Ex. 1 at ¶7.

On October 30, 2020 (now three weeks post-vaccination), Petitioner sought treatment at an urgent care facility. Ex. 13 at 7. She reported "right arm pain and swelling and weakness in the right hand." *Id*. She stated that she "got a flu shot in the right arm about 3 weeks ago and the symptoms have occurred since that time and are slowly getting worse." *Id*. On exam, she had decreased muscle mass, normal strength, normal range of motion, and "some very slight swelling in the right forearm." *Id*. at 10-11. An ultrasound was recommended to rule out a blood clot. *Id*. at 11. The ultrasound, performed on November 11, 2020, revealed a "thickened appearing" biceps muscle, but no clot. Ex. 12 at 78-79.

Petitioner followed up with her primary care physician ("PCP") on November 13, 2020. Ex. 14 at 157. She reported that she had a flu vaccine and that her "right arm swelled and became weak." *Id*. at 158. Her symptoms were improving, however, and she reported "full function with little tenderness." *Id*. No treatment was recommended. *Id*.

2

Petitioner states that she "was under the impression from her primary care provider that there was nothing to be done regarding her right shoulder pain and that she would just have to give the injury time to heal." Mot. at 4; Ex. 1 at ¶11.

Petitioner did not seek treatment for her shoulder pain again until August 27, 2021 - more than ten months after her vaccination. During the intervening period, she saw her orthopedist on January 5, 2021 for an annual follow up after her right knee replacement and for ongoing knee pain, for which she received a steroid injection. Ex. 6 at 17. She returned to the orthopedist for another left knee injection six months later, on July 6, 2021. *Id*. at 18. Petitioner also saw her PCP twice during the intervening period, on March 23, 2021 and July 13, 2021, to follow up on her hypertension. Ex. 14 at 178, 211. She expressed that her musculoskeletal pain was controlled on her current regime of gabapentin and tramadol. *Id*. at 178, 210. The records of these visits do not include shoulder pain.

On August 27, 2021, Petitioner established care with a new PCP. Ex. 4 at 7. She now reported "consistent right arm pain since getting her flu shot last season," adding that she had experienced "immediate pain and loss of use of her right arm." *Id*. Petitioner explained that "her PCP at the time did not seem to take her complaint seriously," but that "over time, she has noted swelling and masses appearing in her elbow joint." *Id*. On exam, the provider noted atrophy of the right upper arm. *Id*. at 8. Additional imaging was recommended. *Id*.

An MRI of Petitioner's humerus performed on October 4, 2021, revealed rotator cuff tendinosis and capsular inflammation, as well as "common extensor and radial collateral ligament pathology of the elbow." Ex. 5 at 3. The MRI report also notes "partial visualization of a reactive glenohumeral effusion with adhesive capsulitis" and a "chronic appearing subtle partial tear of the radial collateral ligament." *Id*.

Petitioner had an initial physical therapy evaluation on October 15, 2021. Ex. 7 at 9. The referring diagnosis was pain and stiffness of the right elbow. *Id*. Petitioner reported that she had a flu shot in her right arm last year, and she lost the use of the arm for six weeks. *Id*. She reported current pain in the biceps and "at the medial elbow." *Id*. On exam, there was swelling in the "lower R arm" and reduced range of motion and reduced strength at the elbow. *Id*. at 10-11. Petitioner shoulder was not assessed. She attended fourteen sessions through December 2, 2021. *See* Ex. 7 at 9-71. Petitioner admits that the physical therapy did not address shoulder pain. Mot. at 5.

Petitioner returned to her new PCP on January 5, 2022 with urinary symptoms. Ex. 4 at 16. She also expressed concern "about her right elbow joint pain and swelling in her right arm." *Id*. The provider reviewed Petitioner's MRI and noted her elbow pathology and adhesive capsulitis. *Id.* at 19. Petitioner was advised to continue PT. *Id*.

Petitioner returned to her PCP on March 7, 2022 with continued complaints of shoulder pain "that started over a year ago." Ex. 4 at 26. She indicated that she had hired a lawyer who recommended that she be evaluated by an orthopedist. *Id*. Petitioner was given a referral to orthopedics for further evaluation. *Id*. at 28

Petitioner saw her orthopedist for right shoulder treatment on April 4, 2022. Ex. 6 at 20.  She reported her flu shot in October 2020, and that "for 6 weeks after that she could not move her arm." *Id*. She noted that "now she still has pain in that shoulder and arm and has never gone completely away." *Id*. On exam, Petitioner had "functional range of motion of her shoulder" with pain and positive impingement signs. *Id*. The orthopedist noted atrophy down her arm. *Id*. An x-ray of her shoulder confirmed degenerative changes. *Id*. Petitioner was diagnosed with rotator cuff tendinitis and AC joint arthritis with impingement. *Id*. She was given a cortisone injection. *Id*. Petitioner returned on May 10, 2022 with reports of improvement after the injection. *Id*. at 21. Her exam revealed improved range of motion to "almost full" and negative impingement signs. *Id*. She was referred back to physical therapy. *Id.*

Petitioner had a physical therapy shoulder evaluation on May 20, 2022. Ex. 7 at 74. She reported "chronic shoulder pain since 2020," but did not mention her flu shot. *Id*. She had three additional sessions of physical therapy through June 6, 2022. *Id*. at 80-92.

There are no additional records of treatment for Petitioner's right arm pain.

III.    **Applicable Legal Standards**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are

internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Act requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act § 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. § 13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at

*4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

## IV.    Findings of Fact

### A. *Severity*

To satisfy the Act's severity requirement, Petitioner must demonstrate that she continued to suffer the residual effects of her vaccine-related injury until at least April 9, 2021 - six months after her likely post-vaccination onset. There is no dispute that Petitioner consistently sought treatment in October and November 2020, but then did not receive additional treatment for approximately eight months, until August 2021. Respondent argues that at her appointment on November 13, 2020, "Petitioner's symptoms were improving and [she] had full function and little tenderness." Resp. at 12. Respondent also notes that Petitioner had two visits with her orthopedist and two visits with her PCP during the gap in treatment where she did not seek treatment for shoulder pain. *Id.* at 12-13.

At the same time, however, there is evidence in the record that Petitioner's shoulder pain continued throughout the period in question. When Petitioner returned to treatment on August 27, 2021, she was explicit in contending that the pain she was experiencing was "consistent" since her vaccination. Ex. 4 at 7. And Petitioner reiterated that fact through her remaining treatment. *See e.g.*, Ex. 6 at 20 (She noted that "now she still has pain in that shoulder and arm and has never gone completely away.").

Further, although the long treatment gap included several intervening medical visits, she has provided a reasonable explanation for why she did not at this time report shoulder issues. Petitioner believed her original PCP did not take her complaints seriously, and thus did not expect to receive treatment that would help her symptoms. Ex. 1 at ¶11; Ex. 4 at 20. The two intervening PCP visits noted by Respondent were with that same doctor, whom Petitioner felt would not be helpful with her shoulder pain. *See* Ex. 14 at 178, 211. This is further corroborated by the fact that when Petitioner did resume treatment for her shoulder pain, she found a new PCP. *See* Ex. 4 at 20. Finally,

Petitioner's visits with her orthopedist during this time were for pre-existing knee problems, including twice-yearly cortisone injections into her left knee. *See* Ex. 6 at 17-18. Petitioner did not seek care from her orthopedist for her shoulder problem until she requested and received a referral from her PCP for that specific problem. *See* Ex. 4 at 26-28. In contrast, Respondent has not identified any evidence in the record that Petitioner's pain fully resolved in less than six months or of another cause for Petitioner's symptoms after the gap in treatment.

As a result, the evidence supports a finding that severity was established (although the almost one-year treatment gap bears *heavily* on the damages, to the extent any are to be awarded in this case).

### B. Onset

Respondent next argues that 48-hour onset cannot be established because Petitioner waited "more than a month" to report her shoulder pain to a medical professional, and "then did not seek any treatment for another eight months." Resp. at 8-9. In support, Respondent points to other treatment Petitioner received during that period without addressing her shoulder pain. *Id*. at 9.

However, there is ample support in the record that Petitioner likely experienced pain within 48 hours after her vaccination. In her declaration, Petitioner recalled pain beginning the day after her vaccination that was severe "to the extent that [she] essentially was unable to use [her] right arm at all." Ex. 1 at ¶7. Petitioner then sought treatment for her pain only three weeks after her vaccination, reporting a flu shot three weeks ago and experiencing symptoms "since that time." Ex. 13 at 7. Although there was a sizeable gap in treatment, Petitioner explained that she did not seek further treatment at the time because she felt that her PCP did not take her complaints seriously and that she believed there was nothing to be done to help her symptoms. *See* Ex. 1 at ¶11; Ex. 4 at 7; Mot. at 5. When Petitioner returned to treatment after the gap, she clearly stated that she had experienced "consistent right arm pain since getting her flu shot last season," and that she had had "immediate pain and loss of use of her right arm" after the injection. Ex. 4 at 7. And throughout her treatment, Petitioner consistently liked her pain to her flu shot, and there is no evidence in the record suggesting a different onset.

### C. Symptoms limited to Vaccinated Shoulder

Respondent notes that Petitioner's pain "was not limited to her vaccinated shoulder," but included pain and swelling in her elbow and later, numbness and tingling in her right hand. Resp. at 9-10. This argument finds substantially more support in the filed medical records.

Petitioner's treatment records contain repeated complaints of pain and swelling in her elbow and lower arm, based on objective findings outside of her shoulder. At her first urgent care visit on October 30, 2020, three weeks after her vaccination, Petitioner was found to have swelling in her forearm. Ex. 13 at 11. When she returned for treatment in August 2021, Petitioner reported increasing symptoms in her elbow. Ex. 4 at 7. Petitioner's MRI confirmed elbow pathology, including a partial tear. Ex. 5 at 3. Thereafter, Petitioner had 14 physical therapy treatments focused on her right elbow, and not on her shoulder. *See* Ex. 7 at 9-71. Petitioner continued to complain of right elbow pain and arm symptoms during her treatment in 2022. *See* Ex. 4 at 16; Ex. 6 at 20.

Petitioner argues that her elbow symptoms were "unrelated and asymptomatic" prior to her vaccination. Repl. at 3. She explains that her reports of symptoms in her elbow and her arm are all explained by the six weeks during which she did not use her arm and experienced atrophy. *Id*. Petitioner concedes that her "elbow pain should be a factor in her damages," but should not preclude a finding that she suffered a Table SIRVA. However, in this case, Petitioner did not merely complain of pain extending from her shoulder pain. From her first urgent care visit, Petitioner had objective swelling in her forearm. Ex. 13 at 11. Then, as her elbow symptoms worsened, an MRI revealed significant elbow pathology separate from any shoulder pathology and Petitioner received treatment for her elbow pain. *See* Ex. 5 at 3; Ex. 7 at 9-71. When Petitioner returned to her doctor after her first course of physical therapy, she was concerned about her "elbow pain and swelling," rather than shoulder pain. *See* Ex. 4 at 16. Further, the fact that an MRI of Petitioner's humerus, rather than her shoulder, was ordered and that physical therapy was ordered for her elbow pain, rather than for her shoulder pain (which existed simultaneously), suggests that both the providers and Petitioner placed a higher emphasis upon the elbow symptoms at that time.

Because Petitioner experienced both subjective and objective symptoms outside of the vaccinated shoulder, in her elbow and forearm, she cannot preponderantly establish the third QAI criterion of a Table SIRVA claim.

### Conclusion

Petitioner has established that she suffered the residual effects of her alleged vaccine-related injury for at least six months and that her pain began within 48 hours of her vaccination. However, as I also find that Petitioner's pain was not limited to her right shoulder, Petitioner's Table SIRVA claim is dismissed. The case will be reassigned to a Special Master outside of the SPU for adjudication as a causation-in-fact claim.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master